# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Joan H. Lefkow | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 01 CR 750 | **DATE** | 1/31/2003 |
| **CASE TITLE** | USA vs. Daniel E. Salley | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m)   ☐ Local Rule 41.1   ☐ FRCP41(a)(1)   ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] Enter Memorandum Opinion and Order. The court finds that the defendant is presently suffering from a mental disease or defect (Delusional Disorder) rendering him mentally incompetent to the extent that he is unable to assist properly in his defense. Therefore, the court commits the defendant to the custody of the Attorney General. The Attorney General shall hospitalize the defendant for treatment in a suitable facility and shall return the defendant to this court promptly after a period of 90 days has passed and shall provide the court with a report on whether the progress of treatment has restored the defendant to competency. The matter will be called for status on May 7, 2003 at 9:30.

(11) ■ [For further detail see order attached to the original minute order.]

| | |
|---|---|
| | No notices required, advised in open court. |
| | No notices required. |
| ✓ | Notices mailed by judge's staff. |
| | Notified counsel by telephone. |
| | Docketing to mail notices. |
| | Mail AO 450 form. |
| | Copy to judge/magistrate judge. |

number of notices: 2

FEB 03 2003 date docketed

docketing deputy initials

1/31/2003 date mailed notice

courtroom deputy's initials: MD

mailing deputy initials: MD

Document Number: 66

# UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | |
| vs. ) | No. 01 CR 0750 |
| ) | Judge Joan H. Lefkow |
| DANIEL E. SALLEY, ) | |
| ) | DOCKETED |
| Defendant. ) | |
| ) | FEB 0 3 2003 |

## MEMORANDUM OPINION AND ORDER

Defendant, Daniel E. Salley ("Salley" or "defendant"), has been charged in a 15-count indictment on charges arising from a bank robbery and the ensuing arrest of defendant on August 28, 2001, which tragically resulted in the severe and long-term disability of Joseph Airhart ("Officer Airhart"), a FBI task force Chicago police officer who was assisting agents of the FBI.[1] Among the many serious charges lodged against defendant are attempt to kill Officer Airhart (Count I) and FBI Special Agent Gary L. Kissinger (Count VI) while in the performance of official duty, both in violation of 18 U.S.C. §§ 1113 and 1114, and armed bank robbery, in

---

[1] One of many press accounts can be found at CHICAGO TRIBUNE, p. 1 (Aug. 29, 2001).

violation of 18 U.S.C. § 2113(a) and (d) (Count XII).[2]  Before the court is the issue of Salley's competency to stand trial.

The United States Attorney maintains that Salley is competent. Salley insists that he is competent. Salley's counsel has taken no position inasmuch as Salley has refused to meet with or talk to him about the case, but he submits "that Mr. Salley's actions and statements raise in my mind serious doubts as to his competency to stand trial." (Defendant's Position Paper, second page). Following a hearing pursuant to 18 U.S.C. § 4241(a) the court, having considered all of the evidence and for the reasons set forth below, concludes that Salley is not competent to stand trial.

## BACKGROUND

Defendant was arraigned on September 21, 2001 and counsel was appointed on September 26, 2001 (Docket Entries # 1, #13.) Pursuant to this court's November 14, 2001 order

---

[2] Other charges include using and carrying, brandishing and discharging a firearm during the commission of a crime of violence, in violation of 18 U.S.C. § 924(c)(1)(A)(i), (ii) and (iii) (Count II); assaulting, resisting, opposing, impeding, intimidating and interfering with Officer Airhart during his assistance of officers and employees of the FBI, in violation of 18 U.S.C. § 111(a)(1) and (2) (Count III); seizing, detaining and threatening to kill Officer Airhart in order to compel the FBI to abstain from entering Salley's apartment, in violation of 18 U.S.C. § 1203 (Count IV); using and carrying, brandishing and discharging a firearm to take Officer Airhart hostage in order to compel the FBI to abstain from doing one or more acts, in violation of 18 U.S.C. § 924(c)(1)(A)(i), (ii) and (iii) (Count V); using and carrying, brandishing and discharging a firearm in the attempted murder of Special Agent Kissinger, in violation of 18 U.S.C. § 924(c)(1)(A)(i), (ii) and (iii) (Count VII); assaulting, resisting, opposing, impeding, intimidating and interfering with Special Agent Kissinger, in violation of 18 U.S.C. § 111(a)(1) and (2) (Count VIII); assaulting, resisting, opposing, impeding, intimidating and interfering with FBI Special Agents Kissinger, Matthew R. Alcoke, Timothy J. Keese, and James J. Bents, in violation of 18 U.S.C. § 111(a)(1) and (2) (Count IX); using and carrying, brandishing and discharging a firearm during the assault on Special Agents Kissinger, Alcoke, Keese and Bents in violation of 18 U.S.C. § 924(c)(1)(A)(i), (ii) and (iii) (Count X); being convicted of a misdemeanor crime of domestic violence and knowingly possessing a firearm, in violation of 18 U.S.C. § 922(g)(9) (Count XI); using, carrying and brandishing a firearm during the commission of a bank robbery on August 17, 2001 in violation of 18 U.S.C. § 924(c)(1)(A) (Count XIII); taking, by violence and intimidation, $239,000, in the presence of bank employees, from Charter One Bank, 3250 West 87th Street, Chicago, Illinois on August 24, 2001 in violation of 18 U.S.C. § 2113(a) and (d) (Count XIV); and using, carrying and brandishing a firearm during the commission of a bank robbery on August 24, 2001 in violation of 18 U.S.C. § 924(c)(1)(A) (Count XV).

(Docket Entry #15), Salley was evaluated for competency to stand trial during a period between December 6, 2001 and February 22, 2002, by Dr. Lea Ann Preston ("Dr. Preston"), a clinical psychologist employed by the Bureau of Prisons. During this evaluation, Salley refused to submit to standardized psychological tests but, based on her interview with Salley, Dr. Preston found that Salley was aware of the nature of the proceedings against him and was able to accurately describe the roles of the various individuals who participate in a trial, knew about the possible pleas that may be entered, and presented rational ideas regarding defense strategies. (Preston rep. at 8.) Based on these findings, Dr. Preston concluded that Salley was competent to stand trial and make decisions regarding his case, although Dr. Preston did note that she was unable to rule out a diagnosis of delusional disorder because Salley was not completely forthcoming while discussing his beliefs. (*Id.* at 6-7.)

At a status hearing before the court on March 22, 2002, however, Salley made bizarre remarks to the court; for example, given the opportunity to speak about the matter of representation, Salley declared, *inter alia*, that $65 million of his assets had been stolen for which he demanded compensation of $555 billion, and he accused the court and the United States of America as being in contempt of "God's court," and "hereby removed [the court] forever by the grace of God . . . ." (Transcript (Tr.) of Proceedings of March 22, 2002 at 3-4.) Salley refused to respond to the court's question whether he was satisfied with counsel's representation, so the court let the matter stand and set a July, 2002, trial date.

On April 10, 2002, counsel moved to withdraw and the court appointed a second attorney. At the next status hearing, however, on April 26, 2002, Salley's counsel presented a motion for leave to proceed *pro se* with standby counsel. Salley denounced new counsel's representation in

terms such as, ". . . He has asserted that he would file motions that I would command him not to file, and that he would not file motions that I would command him to file based upon his personal ethics. I'm not here to request anything of this particular Court. I am asserting the commands of his majesty, and I am . . . asserting also the inalienable rights . . . ." (Tr. of Proceedings of April 26, 2002 at 3.)

On May 29, 2002, Salley's second counsel presented a motion to withdraw. Salley again lectured the court, ". . . Let us not pretend that this is going to be fair. I have a defense, and I will be defending in the way that I decide that it is going to be done, not according to someone that you have appointed to me. . . ." (Tr. of Proceedings of May 29, 2002 at 3-4.) Salley stated that if counsel of his liking were not found he wished to represent himself. (*Id.*)

On June 5, 2002, due to the court's concern that the original mental health evaluation did not address whether Salley could adequately cooperate with counsel, this court concluded that Salley needed to be sent back for a further evaluation to make this determination. *See United States* v. *Teague,* 956 F.2d 1427, 1432 (7th Cir. 1992) ("Due process requires that when sufficient evidence demonstrating reasonable cause to believe that a defendant is mentally incompetent to proceed [is] before the court, it must order a competency hearing.") This evaluation was again slated to be performed by Dr. Preston as a supplement to her original report.

The anticipated hearing on the matter of whether defendant could cooperate with counsel was aborted, however, because Salley had refused to speak again with Dr. Preston. Salley further advised the court that because Dr. Preston had concluded that he was competent, "this can be construed also as an abuse of discretion because there is an attempt by the prosecution to take away my right to defend myself. . . ." (Tr. of Proceedings of June 24, 2002 at 6.) This statement

4

was in the face of protestations by the Assistant United States Attorney that defendant was certainly competent and that further evaluation was unnecessary. (*See id.* at 9.)

The court then ordered a second evaluation which was conducted by Dr. Christine Scronce ("Dr. Scronce"), also a clinical psychologist employed by the Bureau of Prisons, during July and August, 2002. Dr. Scronce concluded that Salley suffers from a delusional disorder. (Scronce rep. at 7.) According to Dr. Scronce, an individual with this mental illness experiences "nonbizarre" delusions, *i.e.*, things that could occur in real life, such as being conspired against or poisoned. (*Id.*) Dr. Scronce observed in Salley "grandiose and paranoid thinking" as reflected in his connecting a surgery that was done on his knee while in custody with his belief in a government conspiracy, stating "I don't know who all the players are, who might be operating behind the scenes. I don't know why they did that second operation." She also reported that he had told the pretrial services officer that during his arrest he had been shot twice in the chest, but "the bullets bounced off." (Scronce rep. at 6.) Dr. Scronce observed that Sally's preoccupation with government conspiracy theories against him and his guarded and uncooperative nature with his attorneys and evaluators, along with other evidence, suggested a major mental illness. (*Id.* at 8-9.) Dr. Scronce concluded that because the delusional thinking would hinder Sally's rational

understanding of the proceedings and his ability to assist his defense, he was not fit for trial.[3] (*Id.*)

After Dr. Scronce's report, the United States requested and the court granted leave to have defendant examined a third time. This examination was performed by Dr. Ronald Roesch of Park Dietz and Associates.[4] In the report, Dr. Roesch concluded that Salley is competent to stand trial. (Roesch rep. at 11-12.) While the report stated that Dr. Roesch could "neither exclude the possibility of delusional disorder nor confirm that diagnosis," Dr. Roesch stated that he did not believe any such delusional disorder "has affected [Salley's] ability to understand the proceedings or the consequences of the trial." (*Id.* at 11.) In support, Dr. Roesch explained that Salley did conduct himself appropriately in many court appearances, particularly when discussing the issue of competency; that it is possible that Salley's unrealistic beliefs as to his self-representation are based on his religious beliefs as well as prior experience in self-representation

---

[3]The concluding paragraph of Dr. Scronce's "Case Formulation" is as follows:

> Mr. Salley's presentation is consistent with a diagnosis of Delusional Disorder. His family reportedly noticed changes in his behavior, and he allegedly made some odd statements at the time of the offense. His age is consistent with the typical age of onset of Delusional Disorder. His former attorney noted his preoccupation with government conspiracy theories. He is guarded and uncooperative with his attorneys and with evaluators. He is insulted by suggestions that he may have a mental illness, and he asserts that the evaluations are intended to deprive him of his right to represent himself. He has asserted he was intentionally "crippled" by an operation to prevent him from escaping custody. While Mr. Salley is articulate and clearly tries to present himself as "normal" during evaluation interviews, his strange statements and erratic behavior in court strongly suggest his thinking is irrational. While it is certainly possible for individuals to demonstrate grandiose and paranoid personality features that do not rise to the level of delusional thinking (i.e., there is no clear break with reality), I believe the weight of evidence indicates Mr. Salley does have a major mental illness. A lack of cooperation during evaluation may also be a sign of malingering. In Mr. Salley's case, however, I believe his reticence stems from paranoia associated with his mental illness rather than willful non-cooperation or an attempt to feign mental illness.

[4]Park Dietz and Associates are forensic consultants in medicine and the behavioral sciences. Dr. Roesch, an associate, conducted the examination, prepared the report, and testified at trial. Dr. Roesch received a Ph.D. in Psychology from the University of Illinois in 1977 and is a professor at Simon Fraser University. Dr. Dietz is a psychiatrist; he participated in preparation of the report (Tr. of Proceedings of October 31, 2002 at 13) and signed it along with Dr. Roesch.

(two successful employment discrimination administrative appeals); and that his defenses involving a government conspiracy do not necessarily reflect delusional thinking, stating,

> While [a government conspiracy theory] may seem far-fetched, in our opinion it does not necessarily reflect delusional thinking. From Mr. Salley's perspective, the IRS did appear to target him and his clients, and he interpreted this as affecting his livelihood and ability to support his family. Mr. Salley was angry at the government and he apparently believes the government's actions toward him justify his robbing banks.

(Roesch rep. at 10.)

On October 31, 2002, the court held a competency hearing during which Dr. Roesch testified. Dr. Roesch reaffirmed his belief that he could not determine, based on Salley's guarded responses, whether Salley suffered from a mental illness. (Tr. of Proceedings of October 31, 2002 at 27.) Nonetheless, Dr. Roesch concluded that Salley is competent to proceed. (*Id.*) Dr. Roesch stated that he reviewed all the information in making this determination, but found particularly significant the in-court transcripts. According to Dr. Roesch, after the March and April hearings, Salley was respectful to the court and made appropriate and rational statements concerning his defense. (*Id.* at 27-28.) In response to Salley's earlier statements concerning his stolen assets and belief in "God's law," Dr. Roesch stated that not enough was known about the basis of the statements concerning the stolen assets, and that the statements concerning "God's law" did not give a basis to conclude that Salley is delusional because there was no information to indicate that these views were delusion-based and not faith-based. (*Id.* at 30-33.) In regard to Salley's anti-government beliefs, Dr. Roesch stated that Salley's statements seem anti-government generally and not persecutory in nature. (*Id.* at 33.) Dr. Roesch stated Salley does

7

not believe that people like President Bush and other government actors are singling him out personally in a vindictive persecutory way. (*Id.*)

Dr. Roesch went on to address Salley's other actions which raised concerns about his competency. With respect to Salley's beliefs that his knee surgery was done to disable him from escaping, Dr. Roesch stated that this statement was never confirmed, but that even if Salley had made such a statement, it would not necessarily lead to a diagnosis of delusional disorder by itself. (*Id.* at 34-35.) Moreover, concerning Salley's statements that bullets bounce off him, Dr. Roesch testified that he interviewed the physician who performed surgery on Salley after the shooting, and he stated that a bullet did in fact enter the right side of Salley's chest and traveled along his rib cage, hit his sternum and then exited. (*Id.* at 25-26.) Thus, to the extent that Salley made such statements, Dr. Roesch concluded that the statements were not based on delusion but on reality. (*Id.*) Finally, Dr. Roesch testified that Salley's inability to work with counsel also does not stem from delusion because Salley's difficulties with his attorneys stemmed from his belief that his attorneys would not present the case in the way that Salley wanted them to. (*Id.* at 37-40.)

## DISCUSSION

Title 18, United States Code, section 4241, provides in pertinent part:

(a) **Motion to determine competency of defendant.**–At any time after the commencement of a prosecution for an offense and prior to the sentencing of the defendant, the defendant or the attorney for the Government may file a motion for hearing to determine the mental competency of the defendant. The court shall grant the motion, or shall order such a hearing on its own motion, if there is reasonable cause to believe that the defendant may presently be suffering from a mental disease or defect rendering him mentally incompetent to the extent that he is unable to understand the nature and consequences of the proceedings against him or to assist properly in his defense.

8

> (b) **Psychiatric or psychological examination and report.**–Prior to the date of the hearing, the court may order that a psychiatric or psychological examination of the defendant be conducted, and that a psychiatric or psychological report be filed with the court, pursuant to the provisions of section 4247 (b) and (c).
>
> \*            \*            \*
>
> (d) **Determination and disposition.**—If, after hearing, the court finds by a preponderance of the evidence that the defendant is presently suffering from a mental disease or defect rendering him mentally incompetent to the extent that he is unable to understand the nature and consequences of the proceedings against him or to assist properly in his defense, the court shall commit the defendant to the custody of the Attorney General. The Attorney General shall hospitalize the defendant for treatment in a suitable facility . . . .

The burden falls on the United States to show by a preponderance of the evidence that Salley is competent to stand trial. *See United States* v. *Teague*, 956 F.2d 1427, 1432 & n.10 (7th Cir. 1992); *United States ex rel. S.E.C.* v. *Billingsley*, 766 F.2d 1015, 1023-24 & n.10 (7th Cir. 1985); *United States ex rel. Bilyew* v. *Franzen*, 686 F.2d 1238, 1244 (7th Cir. 1982).

Under section 4241(d), if the court finds (a) that the defendant suffers from a mental disease or defect (b) that renders him . . . unable to understand the nature and consequences of the proceedings against him or (c) to assist properly in his defense, the defendant must be committed to the custody of the Attorney General for treatment in a suitable facility. A defendant is competent to stand trial if he "has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding . . . [and] a rational as well as factual understanding of the proceedings against him." *Cooper* v. *Oklahoma*, 517 U.S. 348, 354 (1996), citing *Dusky* v. *United States*, 362 U.S. 402 (1960). Merely having a mental illness is not enough to declare a defendant incompetent. *E.g.*, *United States* v. *Leggett*, 162 F.3d 237, 244 (3rd Cir. 1998) ("[A]n axiom [is] generally observed by courts: *i.e.*, [i]t does not follow that because a person is mentally ill [that person] is not competent to stand trial.") (internal quotations marks

9

omitted). Rather, the illness must impair the defendant's ability either to understand the nature and consequences of the proceeding or to assist properly in his defense. *See United States* v. *Timmins*, 301 F.3d 974, 979 (9th Cir. 2002) (Shadur, J. sitting by designation) (pointing out that the test consists of two prongs: understanding the proceedings and cooperation with counsel). Factors the court may consider include, *inter alia*, testimony from psychiatrists, the defendant's behavior–both before the court and elsewhere, intelligence, lapses of memory, and unresponsiveness. *United States* v. *Blohm*, 579 F. Supp 495, 500 (S.D.N.Y. 1993). This court has also considered defense counsel's observations. *But see Timmins*, 301 F.3d at 981 ("[A] lawyer is not a trained mental health professional capable of accurately assessing the effects of paranoid delusions on the client's mental processes.")

## A. Ability to Understand the Nature and Consequences of the Proceeding

With respect to the first prong of the competency analysis, the court concludes that the United States has met its burden of showing that Salley understands the nature and the consequences of the proceedings against him. Dr. Preston so concluded. (Preston rep. at 8.) Dr. Scronce concurred at least to the extent that defendant "has a good factual understanding of the legal process (e.g., the roles of courtroom personnel, the purpose and process of a trial, available plea options)," yet believing that his *"rational* understanding of the proceedings" was hindered by his delusional disorder. (Scronce rep. at 8.) Dr. Roesch also stated in his report that Salley "appreciates the range and nature of possible sentences." (Roesch rep. at 11). Dr. Roesch, in his testimony, further explained that Salley's behavior in court appearances after March and April help to illustrate his understanding of the issues involved. (Tr. of Proceedings of October 31, 2002 at 27-28.) Thus, there is a consensus among the evaluators, and the court agrees, that

Salley understands the nature and potential consequences of the proceedings against him. For these reasons, the court concludes that the first prong of the competency test is satisfied.

**B.      Ability to Properly Assist in Defense**

The court confronts much more difficulty on the other prong of the competency test, whether defendant has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding. As the court points out in *Timmins*, 301 F.3d at 979, "[This] requirement, though less frequently focused on in the case law,[5] adds independent content to the judicial inquiry beyond the first . . . factor."

Cooperation with counsel has been described as "the capacity to provide whatever assistance counsel requires in order to explore and present an adequate defense." R. Bonnie, "*The Competence of Criminal Defendants: Beyond* Dusky *and* Drope," 47 U. MIAMI L. REV. 539, 552 (1993);[6] *see also, Dusky*, 362 U.S. at 402. Components of such capacity necessarily include the fundamentals addressed above, that of understanding the nature and possible consequences of the proceeding. In relation to cooperation with counsel, these capacities are put to the test, particularly when defendant is faced with choices whether to waive constitutional rights, such as to waive the right to counsel, to plead guilty or go to trial, to waive a jury, to cross-examine witnesses, and to testify in his own defense. *See Godinez v. Moran*, 509 U.S. 389, 399 (1993) (identifying choices which criminal defendants face). Without the defendant's ability to appreciate and weigh information and advice, counsel cannot effectively fulfill his role as

---

[5] Indeed, this court finds no decision of the Seventh Circuit that treats this prong distinctly from the understanding prong.

[6] The Bonnie article was recommended to the court by Dr. Roesch. (Roesch rep. at 10 n.2.)

counselor. *See United States v. Nagy,* No. 96 CR 601, 1998 WL 341940, at *6 (S.D.N.Y. 1998), *quoting United States v. Hemsi,* 901 F.2d 293, 295 (2d Cir. 1990), and *Dusky,* 362 U.S. at 402 ("[I]t is not sufficient merely that the defendant can make a recitation of the charges or the names of witnesses, for proper assistance in the defense requires an understanding that is rational as well as factual.") (internal quotation marks omitted).[7] Finally, in order to cooperate with counsel, a defendant needs to understand the role of counsel, *i.e.*, that the attorney has authority to make decisions in the case[8] (although the decision to waive constitutional rights ultimately rests with the defendant alone). Without this, the lawyer is placed in an untenable position of taking direction from a non-lawyer, who is not bound by oath and training to the principles that govern defense and trial of a case.

The court has carefully reviewed the evidence and concludes that the United States has not carried its burden to show that defendant is capable of cooperating with counsel. The following reasons are primary:

(1) Although Salley originally expressed merely dissatisfaction with his first attorney, stating to Dr. Preston that the attorney had refused to file a motion to reconsider denial of bail and that he was not properly investigating the case, as the case progressed it became clear that defendant is incapable of placing sufficient trust in counsel to permit counsel to represent him

---

[7]In *Timmins*, defendant asserted on appeal that he had not been competent to enter a guilty plea and the court of appeals remanded for consideration of whether, disregarding counsel's opinion that he could cooperate with counsel, the defendant could make the choice to plead guilty or not guilty in rational and nondelusional terms. "If a defendant does not have the mental capacity to consider the acceptance of the plea bargain in rational and nondelusional terms, his defense (as it is then constituted) is compromised." *Timmins,* 301 F.3d at 982.

[8] "[D]ecisions on what witnesses to call, whether and how to conduct cross-examination, what jurors to accept or strike, what trial motions should be made, and all other strategic and tactical decisions are the exclusive province of the lawyer after consultation with the client." ABA STANDARDS OF PROFESSIONAL CONDUCT § 4 - 5.2(b) (1986), cited by Bonnie, *supra* at 553 n.58.

12

effectively. Even the first attorney reported to Dr. Scronce that although Salley at first seemed rational and cooperative, "[a]s the case progressed he became more withdrawn and preoccupied with government conspiracy theories." (Scronce rep. 4.) By the time Dr. Scronce evaluated Salley in July/August 2002, he had fired his first attorney and refused even to engage in conversation about the case with his second attorney. Dr. Roesch minimized the significance of Salley's refusal to work with his present counsel because Salley conceded that there are "very professional individuals in the legal field" and he would want such a person to represent him. (Roesch rep. at 8). Dr. Roesch, however, did not address the fact that Salley by refusing to talk with his counsel has had no opportunity to measure whether counsel is among those "very professional individuals" whom he would allow to represent him. Rather, in June, 2002, Salley described defense counsel to his mother as "the treacherous defense attorneys they have been trying to force me to have. . . ." (Roesch rep. at 9.) Dr. Roesch also surmised that if Salley's motion to represent himself is denied, he may accept that ruling and cooperate with counsel. Dr. Roesch does not explain, however, on what basis such trust could be forthcoming in light of Salley's paranoia and at best borderline delusional condition. And more troubling, according to Dr. Roesch, Salley would in any event insist on having the right to make final decisions about such things as rules of evidence, conceding only that he would welcome the opinion of his attorney.

(2) Salley's personal history is consistent with Dr. Scronce's observation that "[h]is age [42] is consistent with the typical age of onset of Delusional Disorder." This would explain why a man of high intelligence who has functioned in society in the past has come to this turn. According to the evidence, in or around 1998-99, Salley's marriage dissolved and his family

13

situation radically changed. He was convicted of unlawful use of a concealed weapon in 1999. In 2000, he was convicted of domestic battery resulting in 18 months probation and an order of protection for the ex-wife and children. In August, 2001, Salley's mother reported that her son had been drinking heavily, expressed increased interest in weapons, and expressed criticism of the government.

(3) Salley's beliefs in a government conspiracy are beyond normal grousing about government. After his arrest, Salley told an FBI agent the government was "trying to take away his livelihood," not a remarkable statement under the circumstances. But other statements do not indicate that such remarks were merely outrage. To Dr. Preston in December, 2001-January, 2002, Salley "expressed a great deal of mistrust regarding the government" and "became indignant when [she] characterized some of his past statements as unusual . . . ." (Preston rep. at 5.) To Dr. Scronce in 2002, Salley expressed his continued belief that the government did not want him to represent himself and that the government performed surgery to incapacitate him. (Scronce rep. at 6.) Although more guarded about the surgery when talking to Dr. Roesch in October, 2002, he asked the doctor whether he thought a malicious purpose was possible and withheld any further response to Dr. Roesch's probing. (Roesch rep. at 8.) Salley has rejected repeated assurances that what he said would not be used against him at trial as a reason not to discuss the case. And, as indicated above, Salley totally rejects his attorney without rational basis. He accuses the United States Attorney of seeking the incompetency finding when it was plain that the United States Attorney contends the defendant is competent. He presumes that the trial will not be fair. Taken together, the evidence demonstrates non-rational, delusional thought patterns about conspiracies against him.

(4) Although it is possible that Salley is simply demonstrating oppositional behavior rather than a delusional disorder, this is unlikely in that Salley is convinced he is competent and wants to go to trial, and his comments to the second and third evaluators were made with the knowledge that the court had doubts about his competency, which would give him incentive to demonstrate realistic and rational thought processes, but instead he persisted in his guarded and distrustful manner.

(5) Salley's grandiosity has been amply demonstrated, and these ideations would certainly impair his capacity to make necessary decisions based on a rational understanding of the consequences. This is demonstrated by Salley's conduct and statements in court as set out above, such as his belligerence towards the court, invoking "Justice," declaring the court "in contempt of God's court," and demanding to be released. The pretrial services officer reported that some of the information Salley provided did not appear to be logical or consistent with other information received and that he seemed "grandiose." He reported to his mother, "We had one hearing two weeks ago and God blessed me to shut the prosecutors, the so-called defense attorney and even the Judge down .... It is difficult for them to deal with a man with superior knowledge and abilities .... This will be the trial of the Millennium[,] Lord willing!" (Although Dr. Roesch minimized such remarks as faith-based rather than delusional, those present in court know that defendant shut down no one.) He insisted to Dr. Roesch that if he had an attorney, he was still to be in charge of the case, reflecting an unrealistic appraisal of his ability to represent himself "to the point of being grandiose." (Roesch rep. at 9.) He wrote to his mother that he was "winning to such an extent that they want to send me back to Springfield MO to have me re-evaluated because I have demonstrated to them that I have a sharp legal mind and

15

that I'm not going to let them railroad me with the treacherous defense attorneys they have been trying to force me to have. . . ." He expressed to Dr. Scronce great confidence that his information would sway public opinion in his favor and put the government in a bad light, that it would be "one of the most interesting trials of the last century." (Scronce rep. at 7.)

In light of the consistency of Salley's belief that the defenders, the prosecutors, the FBI and the court are all against him; the observations of irrational statements and conduct made by Salley's mother, the FBI agent and the pretrial services officer; the absence of any cooperation with counsel; the defendant's grandiose thinking with respect to his ability to represent himself and his prospects at trial, this court concludes that Salley is not competent to stand trial because, although he understands the nature and consequences of the proceeding, he lacks the capacity to cooperate with counsel. As a result, defendant lacks the competence to make rational choices about fundamental decisions such as whether to waive his right to counsel, to plead guilty, to confront the witnesses against him through cross-examination, or to testify in his own defense. This court acknowledges that the public policy is best served by bringing an accused to justice on an expeditious basis, and that a defendant, like any other person, has a right to autonomy in fundamental matters such as this. Under the standard of 18 U.S.C. § 4241(d), however, this court cannot conclude by a preponderance of the evidence that this defendant is competent.[9]

---

[9]The notion that an incompetent may not stand trial is viewed as fundamental to our adversary system, the policies served include balancing one's right to personal autonomy against the need to protect the dignity of the trial process, accuracy in adjudication, the appearance of justice, and the philosophy of punishment that "[r]etribution seems inappropriate for one who does not understand the reason for his imprisonment." B. Winick, *"Restructuring Competence to Stand Trial,"* 32 U.C.L.A. L. REV. 921, 953-57 (1985).

## CONCLUSION AND ORDER

For these reasons, the court finds that the defendant is presently suffering from a mental disease or defect (Delusional Disorder) rendering him mentally incompetent to the extent that he is unable to assist properly in his defense. Therefore, the court commits the defendant to the custody of the Attorney General. The Attorney General shall hospitalize the defendant for treatment in a suitable facility and shall return the defendant to this court promptly after a period of 90 days has passed and shall provide the court with a report on whether the progress of treatment has restored the defendant to competency. The matter will be called for status on May 7, 2003 at 9:30.

ENTER:

_____
JOAN HUMPHREY LEFKOW
United States District Judge

Dated: January 31, 2003